1

2          14 NOV -7  AM 8: 22

3          CLERK US DISTRICT COURT
           SOUTHERN DISTRICT OF CALIFORNIA
4

5                              NP  DEPUTY

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   ERIC JOSEPH RODRIGUEZ,              CASE NO. 13cv0962-LAB(KSC)

                              Petitioner,    REPORT AND
12        vs.                             RECOMMENDATION OF UNITED
                                          STATES MAGISTRATE JUDGE
13   M.D. BITER, Warden,                  RE: DENYING PETITION FOR
                                          WRIT OF HABEAS CORPUS
14                            Respondent.

15

16        On June 7, 2013, Eric Joseph Rodriguez ("Petitioner"), a state prisoner

17   proceeding *pro se* and *in forma pauperis*, filed his First Amended Petition for Writ of

18   Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. [Doc. 4] The petitioner

19   argues that there was insufficient evidence to support his conviction for second-degree

20   murder and that the trial court deprived him of due process by excluding potentially

21   exculpatory evidence at trial. *Id.* at 13.

22        This Report and Recommendation is submitted to United States District Judge

23   Larry A. Burns pursuant to Title 28, United States Code, Section 636(b), and Civil

24   Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern

25   District of California.  Based on the moving and opposing papers, and for the reasons

26   outlined below, this Court **RECOMMENDS** that the Petition be **DENIED**.

27   / / /

28

# I. PROCEDURAL AND FACTUAL HISTORY

On May 5, 2008, petitioner Eric Rodriguez was charged with four others in a two-count complaint alleging conspiracy to commit a crime under California Penal Code § 182(a)(1) and murder under California Penal Code § 187(a). [Lodg. 1-2,[1] pp. 386-92] The other named defendants were Larry Garcia, Monica Bernal Cobian, Rosamelia Felix Cordova, and Sergio Navarro. *Id.* In sum, the complaint alleged that these five were members or associates of the Sidro criminal street gang who confronted, assaulted, stabbed and killed a fellow gang member for collecting money and drugs ("taxing") without permission from Sidro gang members. *Id.* at 388.

On June 5, 2009, a superceding two-count information was filed charging only Eric Rodriguez and Larry Garcia (hereinafter "petitioner" and "co-defendant") with the conspiracy and murder. The remaining defendants were dismissed from the information, and later testified as witnesses for the state pursuant to cooperation agreements signed with the District Attorney's office. [Lodg. 2-2; pp. 406-413; Lodg. 2-3, p. 664; Lodg. 2-7, p. 1238] The petitioner and his co-defendant proceeded to a jury trial.

## A. Petitioner's Motion to Admit Evidence

Before trial, the petitioner moved in limine to admit evidence relating to the earlier murder of another gang member, Francisco "Goofy" Hernandez. [Lodg. 1A-1, pp. 54-59] The petitioner argued that the evidence tended to show that his co-defendant was involved in Goofy's murder, and the victim in this case (Araceli Granados) knew about it. The petitioner argued that this evidence proved that the co-defendant had an independent motive for killing the victim, which would be a defense to the charge that the petitioner aided and abetted the murder.[2] *Id.*

---

[1] "Lodg. 1-2" refers to the second Volume of the first Lodgment.

[2] The petitioner erroneously refers to the excluded evidence as "third-party culpability evidence." [Doc. 4, p. 21] This term is inaccurate as the evidence does not tend to show that someone other than the petitioner committed the crime which he contests, aiding and abetting the murder. This error, however, does not affect the Court's analysis.

13cv0962-LAB(KSC)

1    While neither the Petition nor the Answer outlines the evidence that the
2 petitioner sought to introduce, the parties' pre-trial briefing submitted as part of the
3 record establishes the following facts.  Goofy Hernandez was stabbed and killed on
4 February 17, 2002, at 10:20 p.m. at the Beyer Street Trolley Station. [Lodg. 1A-1, p.
5 2] Minutes before his death, he was seen fighting with another male while a female
6 looked on. *Id.* Cell phone records show that the victim in this case (Araceli Granados)
7 called Goofy four times on the day of his murder.  *Id.* at 61.  Witness testimony
8 corroborated by cell phone records further establishes that the co-defendant called
9 Goofy from a friend's cell phone less than 90 minutes before Goofy's death, and they
10 spoke for 27 minutes. *Id.* Family and friends of the victim in this case, Ms. Granados,
11 reported that when she learned of Goofy's murder, the victim said to a fellow gang
12 member, "we're next" (or words to that effect). *Id.* at 62.  The petitioner argues the
13 totality of this evidence supports the inference that 1) the co-defendant was involved
14 in Goofy's murder, and 2) the victim, Ms. Granados, knew that he was. [Doc. 4, p. 14]

15    The record reveals that the state initially sought to introduce the above evidence
16 in its case in chief against both defendants, but then decided not to. *See* [Lodg. 1A-1,
17 pp. 8, 60] In response, the petitioner moved in limine to admit this evidence, or in the
18 alternative, to sever his trial from the co-defendant. [Lodg. 1A-1, pp. 54-59] The co-
19 defendant objected to the petitioner's motion on the grounds that the evidence
20 constituted inadmissible evidence of prior, uncharged acts under California Evidence
21 Code § 1101. *Id.* at 60-63.  The trial court denied the petitioner's motion to admit the
22 evidence under California Evidence Code § 352, finding that the evidence was
23 irrelevant and that its probate value was substantially outweighed by the probability
24 that its admission would be unduly time consuming and potentially confusing to the
25 jury. *See* [Lodg. 5, p. 28] The trial court also denied the petitioner's motion to sever,
26 which is not at issue in this Petition.
27 / /
28 / /

- 3 -

13cv0962-LAB(KSC)

## B. Evidence Adduced at Trial

The jury trial against the petitioner and the co-defendant began on May 12, 2010. [Lodg. 2-1] The state called 21 witnesses and introduced 47 exhibits over the course of a three-week trial. [Lodg. 2-1 to 2-9] The co-defendant did not present evidence, and the petitioner called only one witness, a private investigator who testified in relevant part that neither the co-defendant nor the victim was listed in the petitioner's cell phone contacts. [Lodg. 2-8, pp. 1551-65] Neither the petitioner nor his co-defendant testified.

The Court of Appeal's opinion sets forth a comprehensive Factual Background summarizing the testimony of the state's witnesses at trial. [Lodg. 5, pp. 4-10] Title 28 U.S.C. §2254(e)(1) creates a statutory presumption that the state court's findings of facts were correct, and the petitioner bears the burden of disproving these facts by clear and convincing evidence. *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir. 2008). In this case, the petitioner concedes the accuracy of the Court of Appeal's factual findings for the purpose of his Petition. [Lodg. 1, p. 15] Furthermore, this Court has conducted an independent review of the trial record and confirmed that the Court of Appeal's factual findings comport with the record. The Court of Appeal found:

> The Mexican Mafia controls most of the street gangs in Hispanic neighborhoods in Southern California, as well as most of the Hispanic criminal activity in the prison system. Every Mexican Mafia member has a person, called a key-holder (in Spanish, *llavero*), underneath him whom the member has placed in charge of a certain neighborhood with full authority to conduct business for that member. The key-holders, each of whom runs a crew of five to 10 people, thus control the Hispanic street gangs on behalf of the Mexican Mafia members.

> One of the jobs of a crew is the collection of a "tax" or kickback from those who conduct criminal activity, such as drug dealing, within the Mexican Mafia member's territory. To collect the tax, gang members may steal money or other property from those involved in the criminal activity. The tax belongs to, and must be given to, the key-holder, the person who runs the neighborhood in which it is collected. The Mexican Mafia member who is in charge of a particular territory must authorize the tax collection activity. A gang member who engages in unauthorized taxing can be "checked," which means beaten up, injured, or, in severe cases, killed.

> Both Garcia [("the co-defendant")], who was known in the Sidro gang as "Termite," and Rodriguez [("the petitioner")], known as "Nino," were admitted members of the San Ysidro or Sidro criminal street gang, located in the community of San Ysidro, documented by the San Diego

13cv0962-LAB(KSC)

Police Department. In 2007 [the co-defendant] was a key-holder and crew leader for Richard "Pops" Buchanan, a Mexican Mafia member from Otay.

[The co-defendant's] Sidro gang crew included [the petitioner], [the petitioner's close family friend] Rosamelia "Muneca" Cordova, Sergio "Shadow" Navarro, Ramon "Sneaky" Mariscal, Francisco "Perro" Valadez, and Araceli "Mousey" Granados [("the victim")], all of whom were members of that gang. Monica Cobian, who in 2007 had a sexual relationship with [the co-defendant], associated with [the co-defendant's] crew.

In March 2007 (all further dates are to calendar year 2007), [the victim], Mariscal, and Valadez participated in unauthorized taxing, with [the victim] using Cordova's name, by taking two ounces of methamphetamine, worth $1,600 on the street, from a methamphetamine dealer nicknamed "Wily." [The victim], Mariscal, and Valadez later got into trouble with [the co-defendant] for the unauthorized taxing.

On March 31, in the afternoon, [co-defendant] was in a motel room at the International Inn in San Ysidro, partying and using drugs with Cobian, Leticia Hernandez, and Hernandez's boyfriend. Cobian overheard a telephone conversation between [the co-defendant] and Mariscal, who was in a nearby motel called the Economy Inn with [the petitioner] and two women from Las Vegas (Lizbeth Ortiz and Norma Rodriguez), about [the victim] being in trouble for taxing. Mariscal testified he told [the co-defendant] during that conversation that [the victim] had arrived in Mariscal's motel room. [The co-defendant] indicated to Mariscal that he was coming over to the Economy Inn. According to Cobian, [the co-defendant] told her he needed to talk to [the victim] and he wanted Cobian to come along and slap [the victim] if she got too loud or out of line when he was talking to her. Cobian testified she drove [the co-defendant] about one block to the Economy Inn in Hernandez's car as it was getting dark.

Navarro testified that at the Economy Inn [the co-defendant] told [the victim] she was leaving with him, and [the victim] became upset and said she did not want to go with him. [The co-defendant] told her, "Well, we're your homeboys; you're coming with us." [The victim] and [the co-defendant] got into Navarro's car with Navarro, who was driving. [The co-defendant] told [the petitioner] to go with Cobian, and [the petitioner] got into the car Cobian was driving.

According to Cobian, before [the co-defendant] drove away with [the victim] and Navarro, [the co-defendant] called [the petitioner] for a suggestion about where they should all go. [The petitioner] asked Cobian, who suggested they go to a ranch in Otay. [The petitioner] relayed that suggestion to [the co-defendant]. Cobian overheard [the co-defendant] tell [the petitioner] he would meet them there. The two cars then drove from the Economy Inn to the ranch.

After [the co-defendant], [the petitioner], [the victim], and the others left for the ranch, Cordova arrived at the Economy Inn to meet with [the co-defendant] at his request. Cordova called [the petitioner], told him she was at the Economy Inn, and asked where everyone was. [The petitioner] told Cordova they were going to the ranch, and Cordova told

13cv0962-LAB(KSC)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

him she would be on her way up there. During this phone call, Cordova also spoke with Cobian, who told her [the co-defendant] wanted her to "check" [the victim], meaning "beat her ass." Cordova then headed for the ranch.

Sometime after midnight on April 1, Cobian stopped the car she was driving on the dirt road leading up to the ranch at the fork in the road, and Navarro pulled his car up behind hers and parked to her right. Cobian testified she got out of the car, approached Navarro's driver's-side window, and saw [the co-defendant] and [the victim] talking in the back seat. She stated that [the petitioner] got out of the car she had been driving and got into Navarro's front passenger seat. [The co-defendant] asked [the victim] about Valadez ("Perro") and what was going on when [the victim] and Valadez were taxing people. [The victim] said something about [the petitioner], and [the co-defendant] said he did not care who was there or what happened, and he just wanted to know where Valadez was.

Cobian testified she and [the victim] began to argue because she (Cobian) assumed [the victim] was there to beat her up. Cobian opened the passenger door of Navarro's car, and [the victim] and [the co-defendant] got out. Cobian was "really annoyed" with [the victim] because their being there had to do with [the victim] and what she did with Valadez. As Cobian started to walk away, [the victim] cursed at her, grabbed her arm, and tried to turn Cobian around. Cobian turned around and slapped [the victim] in the face. Navarro intervened and [the victim] calmed down. [The victim] turned to [the co-defendant] and asked him what was it that he wanted to know. [The co-defendant] told [the victim] he wanted to find Valdez and [the victim] agreed to take him to Valadez.

According to Cobian, everyone then got back into the two cars. [The petitioner] and Cobian got back into the car she had been driving, and Navarro, [the co-defendant], and [the victim] got back into Navarro's car. As they were driving away, Cordova called [the petitioner] to say she was almost there. In her testimony, Cobian indicated she took the call and told Cordova they were leaving and she had slapped [the victim]. Cordova replied, "No. No. Just stay there. Just stay there. I'm almost there." Cordova testified that Cobian was mad and screaming, she told Cordova she had already hit [the victim], and she asked Cordova to hurry up because [the co-defendant] wanted her there. Cordova told Cobian she was almost there.

At a narrow part of the road, the two cars encountered the lifted truck in which Cordova was riding, and Cordova called again and asked that they turn around. According to Navarro, [the co-defendant] got out of his car, Cordova got out of the truck, and [the co-defendant] and Cordova spoke while [the victim], who was acting nervous, remained in the back seat of Navarro's car. [The co-defendant] got back into Navarro's car, Navarro and Cobian made U-turns, and the three vehicles drove back toward the ranch and parked where Cobian and Navarro had previously parked.

Cordova got out of the truck, reached inside Navarro's car through the rear passenger door, and pulled [the victim] out by her hair. Still holding [the victim] by her hair, Cordova began punching [the victim], who had stumbled to the ground, with her free hand. According to Cobian, Cordova punched [the victim] repeatedly for about 30 seconds as

13cv0962-LAB(KSC)

the others watched. According to Navarro, [the co-defendant] ordered the attack on [the victim] because of her role in the unauthorized taxing.

After the beating, [the victim], stood up, dusted herself off, and began cursing everyone. According to Cobian and Navarro, [the victim] began walking away, saying she was going to report them to the police. Cordova testified this made her feel paranoid because she had violated her probation. According to Cobian, [the petitioner] picked up two or three pebbles, threw them in [the victim's] direction, said, "Oh, nothing really happened to you," and told her to come back.

Cobian asked [the co-defendant] whether he was going to let her walk away. [The co-defendant] looked at Cobian and then he and [the petitioner] quickly walked over to [the victim]. According to Cobian, [the petitioner] said, "Just come back. You're not going to walk." [The co-defendant] and [the petitioner], both of whom were wearing gloves, grabbed [the victim's] sweatshirt and began pulling her back to the group. According to the testimony of Cobian and Cordova, [the petitioner] took two steps back, [the co-defendant] turned and stabbed [the victim] repeatedly and rapidly in the chest, and [the victim] fell to the ground.

Deputy Medical Examiner Christopher Swalwell of the San Diego County Medical Examiner's Office testified that [the victim] sustained three stab wounds: two to her chest and one to the base of her neck. An autopsy revealed that the fatal stab wound penetrated the heart and cut the pulmonary vein leading to [the victim's] right lung, causing her to bleed to death.

According to Cobian and Navarro, [the co-defendant] ordered the others to leave after he stabbed [the victim], and everyone drove away leaving [the victim's] body on the ground.

Later that morning, between 7:00 and 8:00 a.m., Simon Ahn discovered [the victim's] body while driving to the ranch where he boarded a horse. He reported the discovery to the ranch managers, one of whom called the police.

That same day, Detective Curt Goldberg of the San Diego County Sheriff's Department arrived at the murder scene. During the investigation that followed, Detective Goldberg interviewed Mariscal and learned that [the co-defendant], [the petitioner], and Navarro were involved in the murder of [the victim].

On April 23 Navarro's car was searched when he met with his parole agent and was arrested for a parole violation. Dana Castro, a criminalist with the San Diego Sheriff's Regional Crime Laboratory, found blood on the back seat and a knife with blood on it. DNA could not be extracted from the blood on the knife. The blood on the back seat of Navarro's car belonged to [the victim].

San Diego Police Department Detective Steven Riddle, a gang expert, opined that the stabbing of [the victim] was for the benefit of the Sidro gang.

[Lodg. 5, pp. 4-10]

13cv0962-LAB(KSC)

## C. Jury Instructions and Closing Arguments

At the conclusion of the presentation of the evidence, the trial court instructed the jury that the petitioner could be found guilty of murder in three ways: as a direct perpetrator, as an aider and abetter, or as a member of a conspiracy. [Lodg. 2-10, pp. 1647-48, 1653] In closing, the prosecutor reiterated these three bases for criminal liability, but argued primarily that the petitioner was guilty as an aider and abettor under the natural and probable consequences doctrine (discussed *infra*) concluding, "that's the theory of liability we're focusing on in this case." *Id.* at 1675, 1680. The prosecutor argued that the defendant not only aided and abetted the initial beating, but also participated in a "second assault," which began when he and the co-defendant grabbed the victim by the arm as she tried to walk away, and ended in her stabbing. *Id.* at 1689, 1694.

The petitioner's trial counsel argued in closing that the petitioner was a mere bystander who had no intent to participate in the assault or murder. [Lodg. 2-10, pp. 1756, 1760] Counsel argued that once the petitioner witnessed the beating, he felt sorry for the victim and was concerned for her welfare. *Id.* at 1761. He assisted her up from the ground, and ran after her to try to convince her not to walk home alone in the dark. *Id.* Defense counsel characterized the petitioner's grabbing the victim's arm as "an attempt by this man to merely bring her back to safety," rather than an assault or aiding and abetting a murder. *Id.* at 1762.

The jury began deliberating on May 28, 2010. [Lodg. 2-10, p. 1789] One week later, on June 4, 2010, the jury rendered its verdict, convicting both the petitioner and his co-defendant of two counts: conspiracy to commit a crime, and murder (second-degree for the petitioner; first-degree for the co-defendant). [Lodg. 2-11, pp. 1798-1805] The jury also found true the alleged gang enhancement under California Penal Code § 186.22 (b)(1). *Id.* On September 27, 2010, petitioner was sentenced to 15 years to life in state prison, plus 10 years for the gang enhancement. [Lodg. 1-3, p. 578;

1   Lodg. 2-14, p. 1853]  (His co-defendant received 50 years to life plus 10 years for the

2   gang enhancement.) [Lodgment 1-2, p. 281]

3   **D.  Direct Appeal**

4         The petitioner timely appealed his conviction to the California Court of Appeal.

5   [Lodg. 1-3, pp. 580, 582; Lodg. 3] The petitioner raised two Constitutional claims on

6   direct appeal: 1) insufficiency of evidence to sustain the murder conviction, and 2) that

7   the exclusion of potentially exculpatory evidence violated his rights to due process, a

8   fair trial, and to present a defense. [Lodg. 3, pp. 26, 51] He also challenged the 10-year

9   sentencing gang enhancement. *Id.* at 56.  On May 3, 2012, the state appellate court

10   affirmed the judgment, but struck the 10-year gang enhancement from the sentence.[3]

11   [Lodg. 5] The petitioner then filed a petition for review with the California Supreme

12   Court, which was denied in a one-line memorandum disposition on August 8, 2012.

13   [Lodg. 7]

14         On June 7, 2013, the petitioner filed a timely Amended Petition for Writ of

15   Habeas Corpus ("Petition") in federal court. [Doc. 4] In his Petition, the petitioner

16   raises substantively the same two arguments that he presented to the California

17   appellate courts.  First, he argues that there was insufficient evidence to sustain his

18   conviction for second degree murder either on the theory that he intentionally aided and

19   abetted the murder, or that the murder was a "natural and foreseeable consequence" of

20   his participation in the assault.[4]  *Id.*  Second, the petitioner argues that the trial court

21   denied him due process, a fair trial, and the ability to present a defense when it

22

23       [3] The Attorney General conceded error because the 15-year minimum parole
24   eligibility requirement imposed by the court for the petitioner's second degree murder
    conviction precluded application of the 10-year term of the gang enhancement. [Lodg.
25   5, p. 30]

26       [4] Though the petitioner's direct appeal challenged the sufficiency of evidence as
    to both aiding and abetting *and* conspiracy, his federal habeas Petition only challenges
27   his liability as an aider and abettor.  Because this Court concludes that the evidence
    was sufficient to sustain his murder conviction as an aider and abettor, this Court need
28   not determine whether the evidence was also sufficient to sustain his conviction as a
    co-conspirator.  *See Chavez v. Sisto*, 341 F. App'x 341, 343 (9th Circ. 2009)
    (unpublished opinion).

1  excluded the potentially exculpatory evidence arising from Goofy's murder. The state

2  concedes that the petitioner's federal habeas claims are fully exhausted. [Doc. 9, pp.

3  9, 17] This Court will evaluate each of the petitioner's claims in turn.

### III. SUFFICIENCY OF THE EVIDENCE

5       The petitioner claims that his due process rights under the 14th Amendment were

6  violated because there was insufficient evidence to sustain his second-degree murder

7  conviction. [Doc. 4, p. 13] Specifically, the petitioner argues that there was

8  "[in]sufficient evidence to convict appellant as an accomplice to murder when it

9  appeared appellant was holding the victim to keep her from leaving, and not so that co-

10  appellant could pull out a knife and kill her." *Id.* He further argues that "the evidence

11  against appellant demonstrated that he was merely present at the scene, or at most,

12  aided and abetted an assault, the natural and probable consequence was not murder."

13  *Id.* at 16.  In support of his claim, the petitioner submits that he did not appear to be

14  involved in the initial plotting prior to leaving the motel, that he was not part of the

15  group of persons that pulled the victim from the motel room and forced her into the car

16  that would take her to the ranch, and that he appeared to try to pacify the situation. *Id.*

17  at 17,18.

18  **A.  Standard of Review**

19       Federal habeas corpus relief is available only to those who are in custody in

20  violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The

21  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a "highly

22  deferential standard" for evaluating state-court rulings on federal habeas review, and

23  "demands that state-court decisions be given the benefit of the doubt." *Woodford v.*

24  *Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted).  Under AEDPA, a federal habeas

25  petition shall not be granted with respect to any claim that was adjudicated on the

26  merits in State court proceedings unless the adjudication of the claim: 1) resulted in a

27  decision that was contrary to, or involved an unreasonable application of, clearly

28  established Federal law, as determined by the Supreme Court of the United States; or

1    2) resulted in a decision that was based on an unreasonable determination of the facts

2    in light of the evidence presented in the State court proceeding. 28 U.S.C.

3    § 2254(d)(1)-(2).

4        The Ninth Circuit has explained that a state court decision is "contrary to"

5    clearly established Supreme Court precedent under § 2254(d)(1) if the state court

6    applies a rule that contradicts the governing law set forth in Supreme Court cases, or

7    if the state court confronts a set of facts that are materially indistinguishable from a

8    Supreme Court precedent but nevertheless arrives at a different result. *Juan H. v.*

9    *Allen*, 408 F.3d 1262, 1270 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

10   On the other hand, a state court decision is an unreasonable application of clearly

11   established federal law if "the state court identifies the correct governing legal

12   principle" from a Supreme Court decision "but unreasonably applies that principle to

13   the facts of the prisoner's case." *Id.* (citing *Williams*, 529 U.S. at 413).

14       The controlling Supreme Court decision on sufficiency of evidence is *Jackson*

15   *v. Virginia*, 443 U.S. 307, 324 (1979). Under *Jackson*, the relevant inquiry is "whether,

16   after viewing the evidence in the light most favorable to the prosecution, *any* rational

17   trier of fact could have found the essential elements of the crime beyond a reasonable

18   doubt." 443 U.S. at 319 (emphasis in original). Put another way, the dispositive

19   question for a reviewing court is "whether the record evidence could reasonably

20   support a finding of guilt beyond a reasonable doubt." *Chein v. Shumsky*, 373 F.3d

21   978, 982-83 (9th Cir. 2004) (citing *Jackson*, 443 U.S. at 318). Because the California

22   Court of Appeal correctly identified *Jackson* as the standard for reviewing sufficiency

23   of the evidence, the question before this Court is whether the Court of Appeal's

24   application of *Jackson* to the facts of this case was "unreasonable" under § 2254(d)(2).

25   [Lodg. 5, p. 12]; *see Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).

26       Procedurally, when a federal court evaluates a habeas petitioner's claim of

27   insufficient evidence, "[t]he *Jackson* standard 'must be applied with explicit reference

28   to the substantive elements of the criminal offense as defined by state law.'" *Chein*, 373

F.3d at 983 (quoting *Jackson*, 443 U.S. at 324 n.16). That means this Court must undertake two distinct steps in its analysis of the petitioner's claim. First, this Court must look to California law to determine the elements of his crime of conviction. Second, this Court must conduct an independent review of the trial record to assess whether the Court of Appeal was objectively unreasonable when it concluded that there was sufficient evidence to sustain the conviction. *Juan H.*, 408 F.3d at 1278 n.14.

A petitioner who challenges a state court conviction on the grounds of federal due process and insufficient evidence "faces a heavy burden." *Juan H.*, 408 F.3d at 1274. The interplay between *Jackson* and AEDPA creates a doubly deferential standard of review. Specifically:

> [W]hen we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted. The *Jackson v. Virginia* standard is itself deferential, as it only permits relief when "no rational trier of fact" could have found the elements necessary for guilt satisfied beyond a reasonable doubt. *Jackson*, 443 U.S. at 324. AEDPA adds a second layer of deference, as it is not enough if we conclude that we would have found the evidence sufficient or that we think the state court made a mistake. Rather, the state court's application of the *Jackson* standard must be "objectively unreasonable" to warrant federal habeas relief for a state prisoner.

*Boyer*, 659 F.3d at 964.

**B. California Elements of Conviction**

As directed by *Juan H.* and *Boyer*, this Court begins its sufficiency review by determining the elements of the petitioner's crime of conviction under California law. At the outset, California law defines assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." CAL. PENAL CODE § 240 (West 2014). Assault is a general intent crime that requires only an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another. *People v. Williams*, 29 P.3d 197, 203-04 (Cal. 2001). California law defines murder as the unlawful killing of a human being or fetus with malice aforethought. CAL. PENAL CODE § 187(a) (West 2014). All murders are classified in the second degree unless the

1  prosecution can prove that the killing was "deliberate and premeditated," or that it falls
2  under one of the other narrow categories delineated by law, none of which apply here.
3  CAL. PENAL CODE § 189 (West 2014).

4       California law creates two distinct forms of culpability for aiders and abettors.
5  *People v. Chiu*, 325 P.3d 972, 974 (Cal. 2014). "First, an aider and abettor with the
6  necessary mental state is guilty of an intended crime. Second, under the natural and
7  probable consequences doctrine, an aider and abettor is guilty not only of the intended
8  crime, but also 'for any other offense that was a "natural and probable consequence"
9  of the crime aided and abetted.'" *Id.* (citing *People v. McCoy*, 24 P.3d 1210 (Cal.
10  2001)). A person becomes liable for a crime as an aider and abettor when he or she
11  "(i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent
12  or purpose of committing, facilitating or encouraging commission of the crime, (iii) by
13  act or advice, aids, promotes, encourages or instigates the commission of the crime."
14  *People v. Cooper*, 53 Cal. 3d 1158, 1164 (1991) (citing *People v. Beeman*, 35 Cal. 3d
15  547, 561). A person who knowingly aids and abets criminal conduct is guilty of not
16  only the intended crime – the so-called target offense – but also of any other crime the
17  perpetrator actually commits that is a natural and probable consequence of the intended
18  crime. *Chiu*, 325 P.3d at 976. "Thus, for example, if a person aids and abets only an
19  intended assault, but a murder results, that person may be guilty of that murder, even
20  if unintended, if it is a natural and probable consequence of the intended assault." *Id.*
21  (citation omitted).

22  **C. The Court of Appeal's Decision Was Reasonable**

23       Where, as here, there is no reasoned decision from the state's highest court, a
24  federal court "looks through" to the "last reasoned state-court opinion" and presumes
25  it provides the basis for the higher court's denial of a claim or claims. *Ylst v.*
26  *Nunnemaker*, 501 U.S. 797, 805-806 (1991). The Court of Appeal concluded that a
27  rational juror could find that the petitioner was guilty of murder under both theories of
28  aiding and abetting liability, that he either shared in his co-defendant's intent to murder

1  the victim or that the murder was a "natural and probable consequence" of the assault.

2  [Lodg. 5, p. 15] Under the doubly deferential standard of review of *Jackson* and

3  AEDPA, this Court finds that the Court of Appeal's conclusion is not an unreasonable

4  application of the Supreme Court's decision in *Jackson*, and therefore

5  RECOMMENDS to the District Court that the petitioner's claim be DENIED.

6
7  **1. A Rational Juror Could Find the Petitioner Directly Aided and Abetted the Victim's Murder**

8      The trial record indicates that a rational juror could find that the petitioner 1) had

9  knowledge of the co-defendant's intent to murder the victim; 2) had the intent to

10  commit, facilitate or encourage the murder; and 3) aided, promoted, encouraged or

11  instigated the commission of the murder. *See People v. Cooper*, 53 Cal. 3d at 1164.

12  The petitioner argues that the trial evidence shows that he was holding the victim to

13  keep her from leaving, rather than to aid and abet in her stabbing. However, this Court

14  finds that the Court of Appeal's interpretation of the evidence is more reasonable than

15  the petitioner's. Furthermore, even if this Court found that the two interpretations of

16  the evidence were equally reasonable, this Court could only grant federal habeas relief

17  if the petitioner had shown that the Court of Appeal unreasonably applied the Supreme

18  Court's deferential *Jackson* standard. The petitioner has not done so here.

19      First, a rational juror could find that the petitioner had knowledge of the co-

20  defendant's intent to murder the victim. The petitioner was a junior member of the

21  Sidro gang who had just watched the victim publicly disrespect and threaten the entire

22  group. Despite the fact that recipients of checking are expected to "lay there and take

23  it," [Lodg. 2-4, p. 710] the victim in this instance fought back even when an onlooker

24  urged her to stop. [Lodg. 2-3, p. 630] The state's gang expert testified at trial that the

25  purpose of a checking is for the disobedient member to "pay repentance" and be

26  restored to the good graces of the gang. [Lodg. 2-5, p. 962] However, after receiving

27  her beating, this victim did not repent. Instead, she stood angrily and started "cursing

28  at everybody" and "telling everybody off." [Lodg. 2-1, p. 310] Next, the victim – who

already had a reputation in the gang as a possible snitch [Lodg. 2-7, pp. 1415-20] –

1 | threatened to "go to the cops and tell on everybody." *Id.* at 312-13.  As the victim
2 | walked away toward the main road, one of the gang's associates asked the co-
3 | defendant, in front of the others, "are you just going to let her walk?" [Lodg. 2-1, 313]

4 |      A rational juror could find that the petitioner perceived that the victim had
5 | seriously disrespected and challenged the authority of his leader.  The rational juror
6 | could further conclude that the petitioner knew the co-defendant intended to kill the
7 | victim when the co-defendant jumped up and "chase[d] after her." [Lodg. 2-7, p. 1259]
8 | The state's gang expert testified that in gang culture, individuals can kill a fellow gang
9 | member in response to an offense or perceived disrespect that is particularly severe.
10 | [Lodg. 2-5, p. 965] The expert also opined that a scenario like the one described above
11 | puts the gang leader "in a situation where they need to take some type of action or lose
12 | face or credibility among those that are around or even those who would hear about
13 | it.... Something has to be done in order to gain or keep that respect or that believed
14 | position with that organization." *Id.* at 976.

15 |      Second, a rational juror could conclude that the petitioner had the intent to
16 | commit, facilitate and encourage the murder because he wanted to improve his standing
17 | within the gang.  A gang detective with the East County Regional Gang Task Force
18 | testified that the petitioner was a young member of the Sidro gang.  [Lodg. 2-7, p.
19 | 1412] "A lot of times, the youngsters will want to be the first one to step-up and prove
20 | themselves." *Id.*  The state's gang expert opined that in a scenario like that described
21 | above, "[m]ost likely those individuals that stepped up would gain respect from that
22 | individual who had the authority because they stepped up and helped." [Lodg. 2-5, pp.
23 | 976]

24 |      Third, a rational juror could conclude that the testimony of the state's
25 | cooperating witnesses established that the petitioner had the intent and did in fact
26 | facilitate and encourage the murder.  The witnesses agreed that the co-defendant and
27 | the petitioner went after the victim as she began to walk away. Monica Cobian testified
28 | that the petitioner warned the victim, "you're not going to walk," and "just come back."

13cv0962-LAB(KSC)

[Lodg. 2-1, p. 314] She testified that they both grabbed the victim's sweatshirt sleeve as if to lead her back to the group, but that the victim was "indecisive" and resisted. *Id.* Ms. Cobian testified that the petitioner and co-defendant may have been "arguing" with the victim, but she could not hear what was being said. *Id.* The petitioner took one or two steps back, and the co-defendant turned around and stabbed the victim three rapid times in her chest. *Id.* at 314-15. Rosemelia Cordova testified that the co-defendant and the petitioner "walk[ed] fast" after the victim. [Lodg. 2-3, p. 635] When they caught up to her, the petitioner held her left arm and the co-defendant bear hugged her "and she was trying to fight back to try to get away." *Id.* She testified that she saw "a lot of hand movements with [the co-defendant's] hand," and then the victim "just dropped." *Id.* at 636.

In sum, a rational juror could conclude that the eyewitnesses' testimony coupled with the expert testimony about the structure and inner workings of gangs proved beyond a reasonable doubt that the petitioner was aware of his co-defendant's intent to murder the victim, and he intended and in fact did facilitate and encourage her murder. Accordingly, the Court of Appeal did not unreasonably apply *Jackson* here.

### 2. A Rational Juror Could Find the Petitioner Aided and Abetted the Assault, a Natural and Probable Consequence of Which Was Murder

The Court of Appeal reasonably applied *Jackson* when it concluded that a rational juror could find the defendant guilty of murder as the natural and probable consequence of the assault. In order to so find under California law, a juror would have to find first that the petitioner aided and abetted the assault, and second that the murder was a natural and probable consequence of that assault.

As an initial matter, the petitioner appears to concede that he aided and abetted the assault. *See* [Doc. 1, p. 14, 18] ("While appellant could have been properly convicted for encouraging the girl fight..." and "While appellant was present during the fights amongst the women, and his presence may have encouraged the brawling..."). Regardless of any concession, the trial record is clear that the petitioner aided and abetted the assault. He was a member of the Sidro gang that planned a checking on a

- 16 -

1   fellow gang member who was in trouble for unauthorized taxing. *See* [Lodg. 2-5, p.
2   873; Lodg. 2-7, p. 1256] The petitioner was in and around the motel room where many
3   of the details of the checking took shape. *See* [Lodg. 2-1, p. 282-83; Lodg. 2-7, pp.
4   1231-32, 1238]  When the co-defendant, the victim, and fellow gang members left the
5   motel room in two separate cars, the petitioner went with them. [Lodg. 2-1, p. 283] On
6   their way out of the motel parking lot, the co-defendant (in one car) radioed the
7   petitioner (in the other car) to ask him where they were going. [Lodg. 2-1, p. 284] The
8   petitioner asked Monica Cobian, his driver, where she thought they should go, she
9   decided to go to the ranch, and the petitioner radioed that information back to the co-
10  defendant.  *Id.* at 284-85.  The petitioner stood by and watched Rosemelia Cordova
11  execute the planned checking in the remote location that he arranged for everyone to
12  meet at, and a rational juror could conclude that his very presence encouraged and
13  facilitated the assault. *See id.* at 309.

14        Furthermore, a rational juror could find that murder was a natural and probable
15  consequence of the assault.  The petitioner was a member of the Sidro gang.  The
16  parties stipulated at trial that "the Sidro Gang...[has], as one or more of its primary
17  activities, the commission of robbery, murder and other violent crimes...." [Lodg. 2-5,
18  p. 972] The petitioner and his co-defendant were both known to carry knives. [Lodg.
19  2-3, p. 640] The co-defendant ordered a checking on the victim in response to her
20  unauthorized taxing. *See* [Lodg. 2-5, p. 873; Lodg. 2-7, p. 1256] Both the state's gang
21  expert and Sidro gang member Rosamelia Cordova testified that checking can, in
22  extreme cases, lead to death. [Lodg. 2-3, pp. 613-14, 640] Under all the circumstances,
23  a rational juror could find that the killing was a natural and foreseeable consequence
24  of the checking assault.

25     **3. Conclusion**

26        California law states that a defendant may be guilty as an aider and abetter either
27  under a theory that he directly aided and abetted a crime, or that the resultant crime was
28  a natural and probable consequence of a lesser crime in which he participated.  Here,

1   the Court of Appeal concluded that a rational juror could have found the petitioner
2   guilty under either theory of aiding and abetting. On the trial record, this was not an
3   unreasonable application of *Jackson*. Accordingly, this Court RECOMMENDS that
4   the District Court DENY the petitioner's first Constitutional argument.

5   ## V. EXCLUSION OF EVIDENCE

6       The petitioner also argues that the trial court denied him due process, a fair trial,
7   and the right to present a defense, when it excluded evidence arising from an earlier
8   gang murder which the petitioner claims would have raised a reasonable doubt as to his
9   guilt in this offense. [Doc. No. 1, p. 21] As discussed in Section I.A, *supra*, the
10  petitioner's trial counsel moved in limine to admit cell phone records and testimony
11  stemming from the murder of gang member "Goofy" Hernandez. The Petition argues
12  that the admission of this evidence would have shown that the co-defendant had an
13  independent motive for killing the victim, which would tend to show that the petitioner
14  did not intend to aid and abet the murder. [Doc. No. 1, p. 21]

15  ### A. Applicable Law

16      A defendant's Constitutional rights to due process and to present a defense
17  originate in the Sixth and Fourteenth Amendments. *Holmes v. South Carolina*, 547
18  U.S. 319, 324 (2006). However, state and federal rulemakers also have broad latitude
19  under the Constitution to establish rules excluding evidence from criminal trials. *Id.*
20  This Court has no authority to review alleged errors in a state's evidentiary ruling.
21  *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998). Rather, the only question
22  before this Court on federal habeas review is "whether the trial court's exclusion of this
23  evidence rendered the trial so fundamentally unfair as to violate due process." *Id.*

24      In deciding whether the exclusion of evidence violates the due process right to
25  a fair trial or the right to present a defense, the Court balances the following five
26  factors: (1) the probative value of the excluded evidence on the central issue; (2) its
27  reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is
28  the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a

1  major part of the attempted defense. *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir.

2  2004); *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000); *Miller v. Stagner*, 757 F.2d

3  988, 995 (9th Cir. 1985) (amended by *Miller v. Stagner*, 768 F.2d 1090 (9th Cir. 1985)).

4  The Court must also give due weight to the state interests underlying the state

5  evidentiary rules on which the exclusion was based. *See Chia*, 360 F.3d at 1006.

6       If the Court concludes that the evidence amounts to Constitutional error, habeas

7  relief is only warranted if the erroneous exclusion had "a substantial and injurious

8  effect" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623, 629-38 (1993). This

9  is the prevailing standard for review of Constitutional violations which are

10  characterized as trial errors, occurring during the presentation of the case to the jury.

11  *Id.*

12  **B. Analysis**

13       A review of the trial record indicates that the exclusion of the evidence about

14  Goofy's murder was not Constitutional error; and even if it was, the petitioner has not

15  shown that its exclusion had a substantial and injurious effect on the verdict.

16  Accordingly, federal habeas relief is not warranted in this case.

17      **1. The Exclusion of Evidence Was Not Constitutional Error**

18       Viewing the petitioner's claims under the *Chia* factors establishes that the Court

19  of Appeal's decision was not an unreasonable application of Supreme Court precedent.

20       The cell phone records reflecting calls between the co-defendant and Goofy were

21  neither reliable nor capable of evaluation by the jury, because, as the trial court noted,

22  there is no way to know what was said in those phone calls. *See* [Lodg. 5, p. 28]

23       The excluded evidence lacked significant probative value on an issue central to

24  the petitioner's defense, because the petitioner's argument requires jurors to make three

25  large inferential leaps. First, the jurors would have to conclude that a phone call

26  between the co-defendant and Goofy an hour before Goofy's death proves that the co-

27  defendant was involved in or authorized the murder. Second, the jurors would have to

28  conclude that the victim's, Ms. Granados', statement to a fellow gang member, "we're

next," proves that she knew that the co-defendant was involved in Goofy's murder. Third, the jurors would have to conclude that the victim's, Ms. Granados', statement after the checking that she was "going to go to the cops" was a) a reference to Goofy's murder, rather than the severe beating that had just taken place, and b) was interpreted as such by the co-defendant. Because the link between the excluded evidence and the petitioner's defense is so attenuated, the evidence lacks significant probative value.

Finally, the excluded evidence does not constitute a major part of the petitioner's defense and is tangential at best. The petitioner's argument regarding the excluded evidence goes to *motive*, which is separate from intent. *See People v. Hillhouse*, 40 P.3d 754, 777 (Cal. 2002) ("Motive describes the reason a person chooses to commit a crime. The reason, however, is different than a required mental state such as intent or malice."). Indeed, petitioner acknowledged this distinction in his original motion to admit the evidence, noting that "motive and intent are *somewhat* intertwined." [Lodg. 1A-1, p. 55] (emphasis added) Two co-defendants may have completely different motives, but they can still form the same criminal intent. Even if the co-defendant's motive for killing the victim was to silence her from disclosing his involvement in Goofy's murder, a rational jury still could have found that the petitioner formed the intent to aid and abet the murder because of his eagerness to step up and prove himself as a junior member of the gang. *See* [Lodg. 2-7, p. 1412-13] For all these reasons, this Court concludes that the exclusion of the evidence was not Constitutional error under *Chia*.

**2. The Excluded Evidence Did Not Have a Substantial and Injurious Effect on the Verdict**

Even if the exclusion had been Constitutional error, habeas relief would not be warranted because the petitioner has not shown that the exclusion had a "substantial and injurious effect" on the verdict. As discussed above, the petitioner faces criminal liability not only for sharing the co-defendant's intent to murder the victim, but also under California's natural and probable consequences doctrine. While the evidence arising from Goofy's murder might have influenced a rational jury to find that the

13cv0962-LAB(KSC)

1  petitioner did not share the co-defendant's intent to murder the victim, the excluded
2  evidence would have no bearing on the petitioner's liability under the natural and
3  probable consequences doctrine.  Even if a rational juror believed every inference
4  suggested by the petitioner, that juror could still find that the murder was a natural and
5  probable consequence of the assault in which the petitioner knowingly and willingly
6  participated.  In sum, the excluded evidence would have had no practical impact on the
7  outcome of the petitioner's case, and certainly not a "substantial and injurious" one.
8  **C. Conclusion**
9      Accordingly, the trial court's exclusion of this evidence did not violate the
10 petitioner's Constitutional rights, and the Court of Appeal's denial of this claim on
11 direct appeal did not result in a decision that was contrary to clearly established Federal
12 law or based on an unreasonable determination of the facts in light of the evidence. *See*
13 28 U.S.C. §2254(d)(1)-(2). This Court RECOMMENDS that the District Court DENY
14 the petitioner's second Constitutional argument.
15           **VI. CONCLUSION AND RECOMMENDATION**
16     The Court submits this Report and Recommendation to United States District
17 Judge Larry A. Burns under 28 U.S.C. §636(b)(1) and Local Civil Rule HC.2 of the
18 United States District Court for the Southern District of California.  For the reasons
19 outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order:
20 1) approving and adopting this Report and Recommendation; and 2) directing that
21 Judgment be entered denying the Petition.
22 //
23 //
24 //
25 //
26 //
27 //
28 //

1    **IT IS ORDERED** that no later than December 12, 2014, any party to this action
2    may file written objections with the Court and serve a copy on all parties. The
3    document should be captioned "Objections to Report and Recommendation."

4    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed
5    with the Court and served on all parties no later than December 30, 2014. The parties
6    are advised that failure to file objections within the specified time may waive the right
7    to raise those objections on appeal of the Court's order. See *Turner v. Duncan*, 158
8    F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d at 1156.

9
10   IT IS SO ORDERED.

11   Date: November ___, 2014

12
13                                              KAREN S. CRAWFORD
14                                              United States Magistrate Judge
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 22 -